**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Leland L. Cogdell, Jr., | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   19-2462 (RC) |
| | : | |
| v. | : | Re Document Nos.:   8, 13 |
| | : | |
| Emily W. Murphy, | : | |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

GRANTING PLAINTIFF'S MOTION TO AMEND;
GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS
OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Leland Cogdell, Jr., used to be an employee at the General Services Administration ("GSA"). He now brings an official-capacity suit against GSA Administrator Emily Murphy alleging violations of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791–794f.[1] The GSA filed a motion to dismiss or, alternatively, a motion for summary judgment. *See* Def.'s Mot. Dismiss or, Alternatively, Mot. Summ. J. ("Def.'s Mot."), ECF No. 8. For the reasons below, the Court denies the GSA summary judgment on Cogdell's failure-to-accommodate claim; grants in part and denies in part the motion to dismiss Cogdell's intentional discrimination claim; and grants in part and denies in part the motion to dismiss Cogdell's retaliation claim. The Court also denies the GSA's motion to dismiss insofar as it seeks to limit Cogdell's potential recovery to benefits he earned before his resignation. Three of Cogdell's claims survive: his

---

[1] Because Cogdell is suing Murphy in her official capacity as the GSA's Administrator, this opinion will refer to the defendant as "the GSA."

claim that the GSA failed to accommodate his disability when it denied him a job coach as well as his claims that the GSA discriminated and retaliated against him when it rejected his request for advanced sick leave.

## II.  BACKGROUND[2]

The Court summarizes the relevant facts as alleged in Cogdell's amended complaint because, when considering a motion to dismiss for failure to state a claim, a court "assumes the truth of all well-pleaded factual allegations . . . and construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014).

Cogdell worked at the GSA for almost fifteen years.  Am. Compl. ¶ 15, ECF No. 13-2. During his tenure there, he suffered from a variety of mental health problems, including autism spectrum disorder, a learning disability, attention-deficit/hyperactivity disorder, obsessive compulsive disorder, and mixed personality disorder.  *Id.* ¶ 11.  Among the consequences of these disorders was that Cogdell had difficulty concentrating.  *Id.* ¶ 12.

A few years after beginning work for the GSA, Cogdell complained that the GSA did not reasonably accommodate his disabilities.  *See id.* ¶ 21.  An administrative judge with the Equal

---

[2] After the GSA filed its motion, Cogdell moved to amend his complaint.  *See* Mot. Am. Compl., ECF No. 13.  The proposed amended complaint adds a few details to Cogdell's factual allegations and attaches an expert report.  *See generally id.* attach. 1, ECF No. 13-1; *see also* Koehler Report, ECF No. 15-1.  A court should "freely give leave" to amend, Fed. R. Civ. P. 15(a)(2), unless there is good reason not to, *Foman v. Davis*, 371 U.S. 178, 182 (1962) (listing, for example, undue delay, bad faith, and futility of amendment).  The "touchstone" is "undue prejudice" to the nonmovant.  *In re Vitamins Antitrust Litig.*, 217 F.R.D. 30, 32 (D.D.C. 2003) (citing *Heyl & Patterson Int'l, Inc. v. F. D. Rich Hous. of V.I., Inc.* (3d Cir. 1981)).  The GSA argues that appending the expert report in the case's current posture is "inappropriate" but does not argue that amendment prejudices it in any way.  Def.'s Reply at 1–2.  Accordingly, the Court permits Cogdell to amend his complaint as proposed.  This opinion will thus refer to the amended complaint as the operative pleading.

Employment Opportunity Commission ("EEOC") agreed and found that the GSA had retaliated against Cogdell too. *Id.* In accordance with the EEOC judge's order, the GSA started allowing Cogdell to work from home four days per week. *Id.* ¶ 22.

At the beginning of April 2014, the GSA assigned Cogdell to be an Internal Communications Specialist. *Id.* ¶ 81. Cogdell says the job, which "require[d] almost-daily deadlines," "was outside [his] skill set[] due to his developmental disabilities." *Id.* ¶¶ 81–82. So from April 15 to June 3, 2014, Cogdell took seven weeks of leave under the Family and Medical Leave Act ("FMLA"). *Id.* ¶ 27. That act "entitles eligible employees . . . to take up to twelve weeks of unpaid leave per year for medical and other specified reasons." *Doe v. U.S. Postal Serv.*, 317 F.3d 339, 340 (D.C. Cir. 2003).

While Cogdell was out on leave in May, the GSA published a job vacancy. Am. Compl. ¶ 28. According to Cogdell, GSA policies required his supervisor, David Wycinski, to inform him of the vacancy while he was on leave "in an alternative manner[] other than sending [it] to his work email address." *Id.* ¶¶ 29–32. Wycinski did not do so. *See id.* ¶ 31.

Cogdell returned from his FMLA leave and, shortly thereafter, made an accommodation request through his cognitive therapist, Dr. Catherine Lee. *Id.* ¶ 36–37. He asked that the GSA provide him with (1) a quiet room when he came into the office to minimize distractions; (2) noise-cancelling headphones; (3) extra time to complete assignments; (4) regular feedback on work product; and (5) a job coach for at least ninety days to help him "re-acclimate" to work after his FMLA leave. *Id.* ¶ 38.

Octavia Richardson, a human resource specialist and reasonable accommodation coordinator, arranged a conference call with Cogdell and Wycinsky that took place about five weeks after Cogdell submitted his request. *Id.* ¶ 49. During the meeting, when Cogdell asked

what was taking so long to respond to his request, Richardson "raised her voice" and exclaimed, "I have 100 Ted Cogdells!"  *Id.* ¶¶ 50–51.

Six weeks later, the GSA granted all of Cogdell's accommodation requests except for the job coach.  *See id.* ¶¶ 46, 52.  Instead of giving Cogdell a job coach, the GSA provided him with a link to online training videos.  *Id.* ¶ 57.  He says that the link did not work and that nobody fixed the issue after he told GSA management.  *Id.* ¶ 58.  In addition, Cogdell filed two appeals of the GSA's accommodation decision, but the GSA never responded.  *Id.* ¶¶ 64–65.

While the GSA was processing his accommodation request, Cogdell also asked for counseling as an employee with a targeted disability.  *Id.* ¶ 39.  An executive order charges federal agencies with identifying a senior official who shall, among other things, "coordinat[e] employment counseling to help match the career aspirations of individuals with disabilities to the needs of the agency."  Exec. Order No. 13,548, 75 Fed. Reg. 45,039, 45,040 (July 26, 2010).  Cogdell says that the relevant agency official at the GSA initially ignored his request for counseling, then transferred it to human resources, and ultimately hung up on Cogdell when he called for an update.  Am. Compl. ¶¶ 42–45.

Cogdell's health deteriorated following the denials of his requests, so he made another accommodation request: that he be able to work from home full-time.  *Id.* ¶¶ 66–67.  The GSA granted the request just over a week later.  *Id.* ¶ 76.  But in the meantime, someone at the GSA became worried that Cogdell was suicidal and called the police to check on him.  *Id.* ¶ 68.  When the police arrived at Cogdell's home, he was not there.  *Id.* at ¶ 69.  Accordingly, the GSA asked him to provide medical certification for his absence.  *Id.* ¶ 70.  It also put him on leave and ordered him to stay away from his GSA workplace for a day.  *Id.* ¶¶ 71–73.

Cogdell teleworked full-time for a month but continued to struggle in his role as an Internal Communications Specialist. *Id.* ¶ 76–77. In December 2014, he went on leave for three weeks. *Id.* ¶¶ 87–88. Dr. Lee submitted a request on his behalf for FMLA leave, administrative leave, or advanced sick leave. *Id.* ¶ 86. The GSA denied the request for advanced sick leave, "even though he met the [relevant] qualifications." *Id.* ¶ 93. It explained that it did not expect Cogdell would return to work (a requirement for advanced sick leave), despite the fact that Dr. Lee's request said he intended to return. *Id.* ¶ 94. In addition, Cogdell claims that the GSA did not tell him about a voluntary leave transfer program that could have benefited him. *Id.* ¶¶ 89–91. He ended up using 107 hours of leave without pay, *id.* ¶ 92, and his net pay fell to "about $203 per month." *Id.* ¶ 96.

After going off and on leave without pay a couple times in January, Cogdell worked full-time from home until July 14, 2015. *Id.* ¶¶ 97–102. During that time period, he was unable to do his job because, according to him, he was not properly accommodated, the job was one he was not trained for, and his supervisor gave "sparing assistance." *Id.* ¶ 103. He stopped working in July and eventually left the agency in February 2016. *Id.* ¶¶ 102, 104, 108.

Cogdell raised informal and formal complaints internally within the GSA to no avail. He then brought this suit, alleging three claims under the Rehabilitation Act: (1) that the GSA failed to reasonably accommodate him by denying him a job coach; (2) that the GSA discriminated against him on the basis of his disabilities; and (3) that the GSA retaliated against him for requesting reasonable accommodations. Compl. ¶¶ 101–27, ECF No. 1; Am. Compl. ¶¶ 109–40.

## III. LEGAL STANDARD

The GSA moves to dismiss Cogdell's complaint or, in the alternative, for summary judgment. *See* Def.'s Mot. at 1. A plaintiff defeats a motion to dismiss under Federal Rule of

Civil Procedure 12(b)(6) if his complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In turn, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint's factual assertions need not be "detailed," but mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).  In assessing plausibility, the court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor but is not required to accept the plaintiff's legal conclusions as correct."  *Sissel*, 760 F.3d at 4 (citation omitted).

A court ruling on a motion to dismiss confines its review to factual allegations in the complaint, documents attached or incorporated into the complaint, and matters of which it can take judicial notice.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  But even when the complaint does not expressly incorporate a document, the court may consider "documents upon which the plaintiff's complaint necessarily relies," including those "produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)).  If the court considers other materials, it must treat the motion as one for summary judgment. Fed. R. Civ. P. 12(d).  The decision to consider documents outside the pleadings and convert a motion to dismiss into one for summary judgment "is committed to the sound discretion of the trial court."  *Maldonado v. District of Columbia*, 924 F. Supp. 2d 323, 328 (D.D.C. 2013) (quoting *Flynn v. Tiede–Zoeller, Inc.*, 412 F. Supp. 2d 46, 50 (D.D.C. 2006)).  Of course, the court must make sure that conversion would be

fair to both parties, ordinarily by giving them notice and an opportunity to present evidence.  *Id.*
But there is an exception to the notice requirement when "the defendant expressly moves for
summary judgment in the alternative to a motion to dismiss before discovery has been
conducted, and relies upon extra-pleading material, to which the plaintiff has an opportunity to
respond."  *Proctor v. District of Columbia*, 74 F. Supp. 3d 436, 448 (D.D.C. 2014).

If the court converts a motion to dismiss into a motion for summary judgment, the usual
summary judgment standard governs.  *See, e.g.*, *id.* at 448–49.  Summary judgment is warranted
only when "the movant shows that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is
one capable of affecting the outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986).  And a dispute is "genuine" if there is enough evidence for a reasonable
jury to return a verdict for the nonmovant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  In
evaluating a summary judgment motion, courts must "eschew making credibility determinations
or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and view
all underlying facts and inferences in the light most favorable to the nonmovant, *see Anderson*,
477 U.S. at 255.  That said, conclusory assertions offered without any evidentiary support do not
establish a genuine issue for trial.  *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

Cogdell brings his claims under the Rehabilitation Act.  The Rehabilitation Act provides
in relevant part that federal agencies shall not "subject[] to discrimination" an "otherwise
qualified individual with a disability . . . solely by reason of her or his disability."  29 U.S.C.
§ 794(a).  By incorporating legal standards from the Americans with Disabilities Act, *id.*
§ 794(d), the Rehabilitation Act permits plaintiffs to enforce its prohibition against various forms

of discrimination, including failure to accommodate, intentional discrimination, and retaliation. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 153 (D.D.C. 2015) (collecting cases).  Cogdell asserts those three types of discrimination here.  He also seeks to broaden the scope of his potential recovery by alleging that the GSA constructively discharged him.  Before addressing his claims and constructive discharge allegation, however, the Court must decide two threshold issues: the extent to which Cogdell exhausted administrative remedies and whether to treat the GSA's motion as one to dismiss or one for summary judgment.

## A. Exhaustion of Administrative Remedies

The Rehabilitation Act requires an employee to exhaust administrative remedies before he initiates a lawsuit under the Act.  *Doak v. Johnson*, 798 F.3d 1096, 1099 (D.C. Cir. 2015).  EEOC regulations outline the administrative remedy scheme for federal employees.  *Id.*  One such regulation provides that an employee who believes he has been subjected to discrimination must confer with an Equal Employment Opportunity ("EEO") counselor at his employing agency "prior to filing a complaint in order to try to informally resolve the matter."  29 C.F.R. § 1614.105(a).  There is a time limit too: he must make contact with a counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  *Id.* § 1614.105(a)(1).  If informal counseling is ineffective, the employee can file a complaint that triggers a formal grievance process in which the agency "investigates, considers, and decides the merits of the complaint."  *Doak*, 798 F.3d at 1099–100 (citing 29 C.F.R. § 1614.106–.110).  Only when that process "concludes or stalls" can the employee file a lawsuit in federal court.  *Id.* at 1100 (citing 29 U.S.C. § 794a(a)(1)).

Having acquired a "final disposition" of an administrative complaint is a jurisdictional requirement of the Rehabilitation Act.  *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006)

(quoting 29 U.S.C. § 794a(a)(1)).  That is not a problem here, because an EEOC administrative judge issued a final order denying Cogdell relief, Def.'s Mot., Ex. M, ECF No. 8-14, and the EEOC affirmed that order on appeal, *id.* Ex. N, ECF No. 8-15.  *See* Pl.'s Resp. Def.'s Statement Material Facts at 4, ECF No. 14-1; *see also Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (explaining that, "where necessary," a court can consider "the complaint supplemented by undisputed facts evidenced in the record" to resolve jurisdictional questions at the motion to dismiss stage).

Unlike the final disposition requirement, administrative time limits set in EEOC regulations—like the 45-day deadline to seek EEO counseling—are nonjurisdictional affirmative defenses.  *See Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  The GSA invokes the 45-day deadline to block Cogdell from recovering for any of the events he describes in his complaint that took place more than 45 days before he sought EEO counseling.  *See* Def.'s Mot. at 8–10.  Cogdell first contacted an EEO counselor on July 23, 2014, so the 45-day deadline bars consideration of events prior to June 8, 2014.  *See* Pl.'s Resp. Def.'s Statement Material Facts at 2.  Cogdell concedes "he is not seeking relief on any claim" based on events before that date.  *See* Pl.'s Opp'n Def.'s Mot Dismiss or in the Alternative Summ. J ("Pl.'s Opp'n") at 1, ECF No. 14.  The Court will hold him to his concession and confine its review accordingly.

### B.  Conversion to Motion for Summary Judgment

Although the GSA styles its entire motion as a motion to dismiss or, in the alternative, for summary judgment, it suggests summary judgment for only one of Cogdell's claims: his failure-to-accommodate claim.  *See, e.g.*, Def.'s Mot. at 1–2.  The Court agrees to convert the GSA's motion on that claim into a summary judgment motion, but it will treat the GSA's motion on Cogdell's other two claims as a motion to dismiss.  *Cf. Page*, 999 F. Supp. 2d at 276 (converting

motion to dismiss into motion for summary judgment on one count but not others); *Boritz v. United States*, 685 F. Supp. 2d 113, 118 (D.D.C. 2010) (similar).

When it comes to Cogdell's failure-to-accommodate claim, both parties repeatedly cite extra-pleading documents (mostly records of the administrative process).  *See, e.g.*, Def.'s Mot. at 11; Pl.'s Opp'n at 5–8; Def.'s Reply at 2–5.  The GSA attached twenty different exhibits to its motion.  *See* Def.'s Mot. at 6.  Cogdell first responded by amending his complaint to attach a report from Dr. Steven Koehler, who opined that the online training videos were no substitute for a job coach.  *See* Mot. Am. Compl.; Koehler Report, ECF No. 15-1.  He then filed an opposition with several exhibits of his own.  *See* Pl.'s Opp'n.  Clearly, Cogdell was on notice that the Court could treat the GSA's motion as one for summary judgment.  *See Proctor*, 74 F. Supp. 3d at 448.  And Cogdell's attaching of exhibits to his opposition demonstrates that he had an opportunity to present his own evidence.  *See Drasek*, 121 F. Supp. 3d at 151 (converting motion when plaintiff relied on extra-pleading materials); *Page*, 999 F. Supp. 2d at 176 (same).  Because both parties rely extensively on extra-pleading documents while arguing over Cogdell's failure-to-accommodate claim, it is safer for the Court to treat the GSA's motion on that claim as a summary judgment motion.  *See Latson v. Holder*, 82 F. Supp. 3d 377, 386 (D.D.C. 2015); *Langley v. Napolitano*, 677 F. Supp. 2d 261, 263 (D.D.C. 2010) ("[I]t is 'probably the better practice for a district court always to convert to summary judgment so as to avoid . . . question[s]' as to whether attached exhibits were properly consider[ed] in ruling upon a motion to dismiss . . . ." (first omission and first alteration in original) (quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.5 (D.C. Cir. 1993)).

With respect to Cogdell's discrimination and retaliation claims, however, the Court will not convert the GSA's motion to dismiss into one for summary judgment.  Resolving

discrimination and retaliation claims requires answering difficult factual questions about motive

and pretext—and on those issues, discovery can be critical.  *See Ross v. U.S. Capitol Police*, 195

F. Supp. 3d 180, 193 (D.D.C. 2016) (observing that it is "especially problematic to permit

acceleration to summary judgment" in employment discrimination cases "because plaintiffs with

such claims ordinarily must marshal the kinds of evidence that one usually can only gather

during the discovery phase").  The Court is not convinced that the extra-pleading evidence the

parties have offered is "comprehensive" enough to "enable a rational determination" of motive-

related issues for summary judgment.  *See Maldonado*, 924 F. Supp. 2d at 328 (quoting 5C

Charles Alan Wright et al., *Federal Practice & Procedure* § 1366 (3d ed. 2012)).  For instance,

even though both parties cite testimony before the EEOC administrative judge, they cite only

scattered excerpts from the record of those proceedings.  *Cf. Ikossi v. Dep't of Navy*, 516 F.3d

1037, 1046 (D.C. Cir. 2008) (holding that plaintiff had demonstrated need for discovery despite

earlier administrative proceedings in part because "[f]ewer than twenty pages of the transcript of

over 300 pages of the hearing before the administrative judge [was] in the district court record").

The Court will thus limit its review on the discrimination and retaliation claims to whether

Cogdell has pleaded a plausible claim for relief.  It will note when it considers documents that

the complaint incorporates or necessarily relies on.  *Cf. Laughlin v. Holder*, 923 F. Supp. 2d 204,

209 (D.D.C. 2013) (considering plaintiff's formal administrative complaint and administrative

judge's order because the complaint referred to them, they were "integral" to plaintiff's

exhaustion of administrative remedies, and they were public records subject to judicial notice).[3]

---

[3] Likewise, the Court treats the GSA's challenge to Cogdell's constructive discharge allegation as a motion to dismiss.  As explained below, the Court construes the allegation as a "component" of each of his Rehabilitation Act claims, *Hammel v. Marsh USA Inc.*, 79 F. Supp. 3d 234, 245 (D.D.C. 2015), so it would be inappropriate to hold Cogdell to the motion-to-dismiss

### C.  Cogdell's Reasonable Accommodation Claim

Under the Rehabilitation Act, federal agencies must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A) (ADA provision); 29 U.S.C. § 791(f) (incorporating ADA standards into the Rehabilitation Act).  That statutory mandate breaks down into four elements that Cogdell must prove to recover for a failure to accommodate: (1) that he was an individual with a disability; (2) that the employer had notice of the disability; (3) that he could perform the essential functions of his position with reasonable accommodation; and (4) that the employer refused to make reasonable accommodations.  *Drasek*, 121 F. Supp. 3d at 155.  Only the fourth element is at issue because the GSA does not attack Cogdell's complaint on the first three.  *See* Def.'s Mot. at 10–11; Def.'s Reply at 2–5; *cf. Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) ("The burden is always on the movant to demonstrate why summary judgment is warranted." (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring))).

The GSA denies refusing to make a reasonable accommodation.  First, it argues that it "was not required to provide the accommodation that Cogdell requested or preferred."  Def.'s Mot. at 11.  Instead, the GSA suggests that it fulfilled its obligation to provide Cogdell reasonable accommodations by giving him the online training videos.  *See id.*

It is true that "[a]n employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation."  *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998).  But one of the requirements for a

---

standard on the discrimination and retaliation claims while demanding him meet the summary-judgment standard to retain his constructive discharge allegation.

reasonable accommodation is that it be effective.  *Edwards v. E.P.A.*, 456 F. Supp. 2d 72, 100

(D.D.C. 2006) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400–01 (2002)).  In other

words, the employer must change its "policies or practices so as to place disabled employees on

the same footing as nondisabled ones."  *Id.*; *see also* 29 C.F.R. § 1630.2(o) (defining "reasonable

accommodation" as "[m]odifications or adjustments" that "enable" a qualified individual with a

disability to be considered for a position, "to perform the essential functions" of a position, or "to

enjoy equal benefits and privileges of employment as are enjoyed by . . . similarly situated

employees without disabilities").

 Despite suggesting that the training videos reasonably accommodated Cogdell, the GSA

does not back that position with any evidence.  By contrast, Cogdell cites letters from two

medical professionals that indicate the training videos would be ineffective.  Dr. Lee wrote the

GSA after it denied Cogdell's job coach request with concerns about the training videos.  She

opined that online training "is typically not appropriate for individuals diagnosed with ADHD"

because they "have difficulty with organization, time management, prioritizing, and shifting

from one assignment to another."  Pl.'s Opp'n, Ex. 8 ("Accommodation Reconsideration

Request"), at 2, ECF. No 14-9.  Dr. Koehler's report, which Cogdell attached to his amended

complaint, confirmed that training videos suffer from "sever[e] limitations."  Koehler Report at

11.  For one, he explained, they are "designed for individuals with normal cognitive processing

speed, average amounts of stress, and no disabilities."  *Id.*  For another, he continued, they are

not interactive or personalized to Cogdell's needs.  *Id.*  By neglecting to point to evidence

unequivocally establishing that the training videos were a reasonable accommodation, the GSA

has not demonstrated that it is entitled to summary judgment at this juncture.

The GSA's more substantial argument is that Cogdell's claim fails because "[a]n employer is not liable for denying an accommodation request if it participated in good faith in an interactive process aimed to satisfy the request." Def.'s Mot. at 11 (quoting *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 73 (D.D.C. 2019)). In fact, "[b]oth parties must engage in this interactive process in good faith, and neither should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." *Id.* (quoting *Weatherspoon*, 380 F. Supp. 3d at 73). Citing Cogdell's testimony at the EEOC, the GSA asserts that Cogdell acted in bad faith when he "did not do the online training that was made available to him and/or he did not need that training." *Id.* It says that warrants summary judgment on his claim. *Id.*

To be sure, once an employee requests an accommodation from his employer, the parties often must engage in an "interactive process" to determine what accommodation would be reasonable. *See* 29 C.F.R. § 1630.2(o)(3); *Minter v. District of Columbia*, 809 F.3d 66, 69 (D.C. Cir. 2015). The reason is that an employer may need more information from the employee about his disability to "identify the precise limitations resulting from the disability and provide potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3); *see also Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014). Indeed, trial and error may be required for the employer to come up with an accommodation that meets the employee's needs. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1168 (D.C. Cir. 2010) (holding that agency made reasonable accommodation when it implemented series of "intermediate steps" before "finally reach[ing] an effective accommodation").

Recognizing that it may take time to figure out a reasonable accommodation for an employee, the interactive-process line of cases provides that an employer does not deny an accommodation unless it "end[s] the interactive process or . . . participate[s] in the process in bad

faith." *Ward*, 762 F.3d at 32; *accord Minter*, 809 F.3d at 69.  By the same token, if the employee

breaks off talks, then fault cannot fairly lie with the employer.  *See Ward*, 762 F.3d at 33–34

(discussing cases holding that employers did not deny their employees reasonable

accommodations when the employees refused to provide information about their disabilities).  So

when a breakdown in the interactive process occurs, the task is to "isolate the cause of the

breakdown and then assign responsibility." *Id.* at 32 (quoting *E.E.O.C. v. Sears, Roebuck & Co.*,

417 F.3d 789, 805 (7th Cir. 2005)).  Behaviors exhibiting bad faith include obstructive or delay

tactics, such as a "fail[ure] to communicate, by way of initiation or response." *Id.* (quoting

*Sears*, 417 F.3d at 805)); *see also Mogenhan*, 613 F.3d at 201 ("[T]here are certainly

circumstances in which a 'long-delayed accommodation could be considered' unreasonable and

hence 'actionable under the ADA.'" (citation omitted)).

Viewing the facts in the light most favorable to Cogdell, it appears that the GSA—not

Cogdell—may have ended the interactive process or participated in the process in bad faith.  The

GSA memorandum giving Cogdell access to online training videos "in lieu of the job coach [he]

requested" did not exactly suggest that the agency was willing to engage in an interactive process

to ensure Cogdell was reasonably accommodated.  *See* Def.'s Mot., Ex. C at 2, ECF No. 8-4.

The memo's subject line read "Reasonable Accommodation – Final Decision." *Id.* at 1.  And it

told Cogdell that his "reasonable accommodation may be re-evaluated if the essential functions

of [his] job change[d], and/or if [his] medical condition change[d]," *id.* at 3—not if the

accommodation did not work.  The only relief the memo offered was that Cogdell could "request

reconsideration of [the] decision" within seven business days of receiving the memo. *Id.*[4]

---

[4] The record does not support Cogdell's argument that the GSA unreasonably delayed responding to his request.  Richardson testified that Wyzinski was out of town for a week, and then it took some time for her to schedule a meeting with him, for her to schedule a meeting with

Seven business days later, Dr. Lee requested reconsideration on Cogdell's behalf.  *See* Accommodation Reconsideration Request.  She asserted that "a job coach is necessary for [Cogdell] to remain in his current position."  *Id.* at 2.  And as already mentioned, she also explained why "online training . . . is typically not appropriate for individuals diagnosed with ADHD."  *Id.*  Critically, Cogdell says that the GSA did not respond to his request, *see* Am. Compl. ¶¶ 64–65, and the GSA has not submitted any evidence to refute his assertion.  Its nonresponse is a classic indicator of bad faith.  *See Ward*, 762 F.3d at 32.

Meanwhile, the sole basis for the GSA's argument that Cogdell acted in bad faith is that he did not try the training videos.  Def.'s Mot. at 11; Def.'s Reply at 3.  It does indeed appear that Cogdell did not try the training videos.  When questioned in the EEOC proceedings, Cogdell testified that he may have looked at the online training courses, but he did not take or complete them because Dr. Lee told him they would be ineffective for him.  *See* Def.'s Mot, Ex. L, at 152, 154, ECF No. 8-13.  That said, the GSA does not cite any authority for the proposition that good-faith participation in the interactive process always requires trying an accommodation.  Of course, complete refusal to attempt an employer's accommodations would be the sort of

---

him and Cogdell, and for Wyzinski to come to a decision.  Pl.'s Opp'n, Ex. 7, at 101–04, ECF No. 14-8.  She said that she "continued to make sure that [she] kept Mr. Cogdell apprised of what the next steps were and what we were doing."  *Id.* at 102:14–16.  It is unclear from the excerpt of GSA policies that Cogdell attached to his complaint whether there was a fifteen-day internal deadline for responding to accommodation requests as he claims.  *Compare* Pl.'s Opp'n, Ex. 5, at 1 ("GSA will process requests for reasonable accommodation . . . in as short a time frame as reasonably possible."), *with id.* at 2 ("In certain circumstances, a request . . . will require an expedited review and decision in a time frame that is shorter than the[]15 business days.").  But even if the GSA missed such a deadline, that alone would not "suffice[] to show a lack of good faith," especially when Richardson was taking steps to process the request and keep Cogdell informed along the way.  *See Matos v. DeVos*, 317 F. Supp. 3d 489, 497–98 (D.D.C. 2018), *aff'd*, No. 18-5281, 2019 WL 2563721 (D.C. Cir. June 3, 2019).  In addition, contrary to Cogdell's assertions that he received no interim accommodation while his request was processed, Wyzinski gave him extra time to complete his assignments.  Pl.'s Opp'n, Ex. 7, at 104–05.

obstructive behavior indicative of bad faith.  *See Ward*, 762 F.3d at 32.  But Cogdell did not

merely refuse to try the training courses.  He requested reconsideration and gave reasons—

backed by a medical professional's opinion—for why the courses would not work.  *See*

Accommodation Reconsideration Request.  The GSA never responded.  In light of the GSA's

denial memo, Cogdell's reconsideration request, and the GSA's nonresponse, the GSA has not

met its burden of showing that there is no genuine dispute as to who should be "assign[ed]

responsibility" for the breakdown between the two parties.  *See Ward*, 762 F.3d at 32 (quoting

*Sears*, 417 F.3d at 805).

Accordingly, the Court denies the GSA summary judgment on Cogdell's failure-to-

accommodate claim.

### D.  Cogdell's Intentional Discrimination Claim

To prove intentional discrimination in violation of the Rehabilitation Act, a plaintiff must

show: "(1) that the employee had a disability within the meaning of the Act, (2) that the

employee was otherwise qualified for the position with or without reasonable accommodation,

and (3) that the employee suffered an adverse employment action solely because of her

disability."  *Drasek*, 121 F. Supp. 3d at 160 (internal quotation marks omitted) (citing *Dorchy v.

Wash. Metro. Transit Auth.*, 45 F. Supp. 2d 5, 10 (D.D.C. 1999)).  The GSA does not dispute that

Cogdell had a disability.  *See* Def.'s Mot. at 12–14.  It instead asserts that he has not pleaded

enough facts to plausibly satisfy the second and third elements.  *Id.*

The Court begins with the third element to frame its analysis in terms of the discrete acts

Cogdell says were discriminatory.  That element encompasses two separate requirements:

"(i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . .

disability."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  "An adverse

17

employment action requires a 'tangible employment action,' meaning 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  *Lurensky v. Wellinghoff*, 167 F. Supp. 3d 1, 15–16 (D.D.C. 2016) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).  When the employee alleges an adverse employment action that does "not obviously result in a significant change in employment status"—for instance, "giving a poor performance evaluation [or] reassigning office space and equipment"—he must "demonstrat[e] how the decision nonetheless caused . . . an objectively tangible harm."  *Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009).  The tangible harm requirement "guards against 'judicial micromanagement of business practices' and 'frivolous suits over insignificant slights.'"  *Lurensky*, 167 F. Supp. 3d at 16 (citations omitted).  As to causation, the Rehabilitation Act requires a "but-for" standard.  *Drasek*, 121 F. Supp. 3d at 154.  That means "a claim cannot succeed unless the protected trait—here, disability—'was *the* reason that the employer decided to act.'"  *Id.* (emphasis added) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Cogdell's opposition memo points to a variety of supposed adverse employment actions contained in his amended complaint:

- the GSA did not inform him about the job vacancy while he was on FMLA leave in May 2014;

- the GSA denied him "a counseling opportunity pursuant to Executive Order 13548, 'Increasing Federal Employment of Individuals with Disabilities'";

- the GSA prohibited him from the workplace for one day in November 2014;

- the GSA required him to conduct an audit of his leave accounting while he was on FMLA leave in December 2014;

- the GSA did not provide him information about the agency's voluntary leave transfer program; and

- the GSA denied him advanced sick leave.

*See* Pl.'s Opp'n at 8–9.[5]

As an initial matter, Cogdell's complaint about the job vacancy is untimely because the GSA posted it in May 2014, Am. Compl. ¶ 28, and Cogdell did not initiate contact with an EEO counselor until over 45 days later, *see* Pl.'s Resp. Def.'s Statement Material Facts at 2.  In any event, Cogdell's theory about the job posting is that the GSA should have informed him about the vacancy announcement while he was on FMLA leave in a manner other than sending it to his work email address.  Am. Compl. ¶¶ 28–34.  He does not allege that the GSA hid the published posting from him or rejected his application when he applied.  Merely not receiving notice of a job posting by one's preferred means does not cause objectively tangible harm.  Indeed, it is this sort of "judicial micromanagement of business practices" that the tangible harm requirement seeks to prevent.  *See Lurensky*, 167 F. Supp. 3d at 16 (citation omitted).

---

[5] Also included in Cogdell's opposition are several allegations that are not in and of themselves adverse actions.  First, he asserts that the GSA reduced his net pay to $203 per month.  Pl.'s Opp'n at 9.  As the Court will explain, however, that was a consequence of Cogdell being on FMLA leave for most of December 2014 as opposed to voluntary leave or advanced medical leave (the GSA's denial of both of which Cogdell alleges are adverse actions).  The pay decrease is not an independent adverse action.  Furthermore, Cogdell says that he "was unable to complete his job functions" because he did not receive proper accommodations for his disabilities.  *Id.*  That allegation repeats his failure-to-accommodate claim, so the Court does not consider it again here.  *Cf. Floyd v. Lee*, 968 F. Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could itself support a claim of retaliation based on the request, then every failure-to-accommodate claim would be doubled.").  Finally, Cogdell describes as another adverse action his inability to work after July 14, 2015.  *Id.*  But because he does not attribute his inability to work to a specific GSA action (aside from the other adverse actions he alleges), the Court will not consider that to be a separate adverse action.

Most of the other actions Cogdell challenges did not amount to a "significant change" in Cogdell's employment status either.  *See id.* at 15–16 (quoting *Burlington Indus.*, 524 U.S. at 761).  Cogdell does not allege any facts to show how he suffered objectively tangible harm when the GSA denied him counseling under Executive Order 13,548, *see* Am. Compl. ¶¶ 39–45, or when the GSA required him to audit his leave accounting while he was out on FMLA leave, *see id.* ¶ 78.  He also does not explain how a brief prohibition from entering the GSA's office space caused him such harm except to offer a conclusory statement that he was "barred from a benefit or privilege of employment on that day."  *See id.* ¶¶ 73–74; *cf. Durant v. D.C. Gov't*, 875 F.3d 685, 698 (D.C. Cir. 2017) (holding that denial of government vehicle was not adverse action because plaintiff offered nothing but conclusory allegations to show injury).  The first four actions Cogdell challenges thus cannot serve as predicates for a discrimination claim.

The remaining two actions are related.  For most of December 2014, Cogdell was on FMLA leave.  *See* Am. Compl. ¶¶ 87–88.  He requested advanced sick leave, but the GSA denied his request.  *Id.* ¶¶ 86, 93–94.  In addition, the GSA allegedly did not inform Cogdell about a voluntary leave transfer program that he says would have allowed him to avoid using 107 hours of leave without pay.  *Id.* ¶¶ 89–92.  Cogdell does not explain how the GSA's voluntary leave transfer program works, but such programs usually permit "eligible employees to receive annual leave donated by other federal employees."  *Nurriddin v. Bolden*, 818 F.3d 751, 754 (D.C. Cir. 2016) (per curiam).  According to Cogdell, because he could not take sick leave or donated leave, he ended up receiving just $203 in net pay that month.  *See id.* ¶ 96.

The advanced sick leave denial was plausibly an adverse action.  Courts in this district have found denials of advanced sick leave to be an adverse action when the request was for "a significant period of time," such as "three to four weeks," or when the plaintiff can show

"financial harm arising out of the denial." *Lurensky*, 167 F. Supp. 3d at 17–18 (citing *Childs-Pierce v. Utility Workers Union of Am.*, 383 F. Supp. 60, 65 (D.D.C. 2005); *Diggs v. Potter*, 700 F. Supp. 2d 20, 43 (D.D.C. 2010)); *see also Brett v. Brennan*, 299 F. Supp. 3d 63, 72–73 (D.D.C. 2018).  The denial at issue here checks both boxes.  Cogdell requested six weeks of advanced sick leave and then was on leave for over three weeks in December and (after a brief period back at work) another week in January.  *See* Def.'s Mot., Ex. H ("Sick Leave Request"), ECF No. 8-9; Am. Compl. ¶¶ 87, 95, 101, 102.[6]  He also pleads that he had to take 107 hours of leave without pay in part because the GSA did not approve his request—even though he met all the relevant requirements.  *See* Am. Compl. ¶¶ 86–94.  The result was that his net pay fell to $203 that month.  *See id.* ¶ 96.  Those allegations show objectively tangible harm, so the GSA's denial of his advanced sick leave was an adverse action.

Cogdell's complaint about the voluntary leave transfer program is a different story.  To be sure, denial of access to donated leave can constitute an adverse action.  *See Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 132 (D.D.C. 2014), *aff'd* 818 F.3d 751 (D.C. Cir. 2016).  But Cogdell pleads no information about the GSA's program whatsoever—nothing about how it functions, whether he would have qualified for it, or whether he could have accessed donated leave on short notice.  All the complaint alleges is that he could have avoided taking 107 hours of leave without pay had the GSA told him about the program.  *See* Am. Compl. ¶¶ 89–92.[7]  As a

---

[6] The Court considers Cogdell's request for advanced sick leave and the GSA's rejection of his request because the amended complaint refers to both materials and summarizes their contents.  *Compare* Am. Compl. ¶¶ 86, 93–94, *with* Def.'s Mot., Exs. H, J.  In other words, it "necessarily relies" on the two documents.  *See Page*, 999 F. Supp. 2d at 275.

[7] The Court notes that Cogdell's case is different from the few others involving voluntary leave transfer programs.  In one case, the plaintiff was already a participant in such a program and alleged that his employer denied him donated leave that he was owed.  *See Nurriddin*, 40 F. Supp. 3d at 132–33.  In another case, the plaintiff alleged that her employer failed to reasonably

result, Cogdell has not pleaded enough factual allegations about the voluntary leave transfer

program "to raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555.[8]

Returning to the advanced sick leave denial, Cogdell satisfies the remaining requirements

to state a claim of intentional discrimination.  He plausibly alleges discriminatory motive.  His

complaint asserts that he met all the GSA's requirements for advanced sick leave and that the

reason the GSA gave for denying his request was unfounded.  Am. Compl. ¶¶ 93–94.

Specifically, the GSA explained that its policies permit advanced sick leave only when there is

"a reasonable expectation that the employee will return to work."  Def.'s Mot., Ex. J ("Sick

Leave Denial"), ECF No. 8-11.  It then denied Cogdell's request because there was no such

expectation.  *Id.*  But as Cogdell points out, his request expressly stated that he "plan[ned] to

return to work."  Sick Leave Request; *see also* Am. Compl. ¶ 94.  And while Dr. Lee's medical

certification in support of the request indicated that Cogdell may need up to ten (or more) weeks

of leave, nowhere did it suggest that he would be unable to return to work.  *See* Sick Leave

Request.  Granting Cogdell all reasonable inferences in his favor, the GSA's dubious explanation

for denying the request makes it plausible that a GSA official harbored a discriminatory motive.

Cogdell also plausibly alleges that he was qualified for his position.  Key here is the

Rehabilitation Act's definition of "qualified individual" as "an individual who, *with or without*

*reasonable accommodation*, can perform the essential functions of the employment position that

---

accommodate her disability when it removed her from its voluntary leave transfer program. *See*
*Carroll v. England*, 321 F. Supp. 2d 58, 69–70 (D.D.C. 2004).

[8] Cogdell has not adequately pleaded an independent claim that the GSA discriminatorily
barred him from its voluntary transfer leave program.  But given that the GSA denied Cogdell
sick leave for the same time period that Cogdell says he should have had access to donated leave,
it may be that discovery into the sick leave denial uncovers evidence of discriminatory conduct
related to the voluntary leave transfer program.  Even though Cogdell no longer has a separate
claim related to the voluntary leave transfer program, such evidence would still suggest that there
was discriminatory motive behind the close-in-time denial of his sick leave request.

such individual holds or desires." *Ward*, 762 F.3d at 28 (emphasis added) (quoting 42 U.S.C.

§ 12111(8)).  Cogdell admits that he could not perform the essential functions of his job but

blames his incapacity on the GSA's refusal to accommodate his disabilities by giving him a job

coach.  Am. Compl. ¶¶ 82–84, 103.  The question is thus whether the job coach would have

reasonably accommodated him.  *See Chinchillo v. Powell*, 236 F. Supp. 2d 18, 23 (D.D.C. 2003)

(citing *Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994)).  That question is at the core of

Cogdell's failure-to-accommodate claim.  For purposes of resolving the GSA's motion to

dismiss his discrimination claim, however, Cogdell has easily surpassed the pleading hurdle by

citing the opinions of two medical experts who believe he could have done his job with a job

coach's help.  *See* Am. Compl. ¶¶ 55, 59, 119–20; Koehler Report at 9–12.[9]

        In sum, Cogdell has stated a plausible intentional discrimination claim—but only insofar

as it is based on the GSA's denial of his advanced sick leave request.

### E.  Cogdell's Retaliation Claim

        Cogdell's last theory of recovery is retaliation.  The elements of a Rehabilitation Act

retaliation claim are: (1) that the plaintiff "engaged in protected activity"; (2) that the plaintiff

"was subjected to adverse action by [his] employer"; and (3) "that there was a causal link

between the adverse action and the protected activity."  *Drasek*, 121 F. Supp. 3d at 162 (quoting

*Alexander v. Tomlinson*, 507 F. Supp. 2d 2, 17 (D.D.C. 2007)).  Cogdell identifies two kinds of

---

        [9] The GSA's sole attack on Cogdell's qualifications misses the mark.  It asserts that
Cogdell was unqualified because "he was unable to work for substantial periods of time."  Def.'s
Mot. at 13.  It is true that "[a]n employee is not 'qualified' under the Rehabilitation Act if her
workplace attendance is so infrequent that she is unable to perform her job."  *Carter v. Carson*,
241 F. Supp. 3d 191, 196 (D.D.C. 2017), *aff'd*, 715 F. App'x 16 (D.C. Cir. 2018).  But Cogdell
has plausibly alleged that the reason he took extended leave was that he was not reasonably
accommodated with a job coach.  Because the GSA does not grapple with his explanation, its
argument falls flat.

protected activities that he engaged in: his accommodation requests (the series of requests that he made in June 2014 and the request for full-time telework that he made in October 2014) and his seeking EEO counseling in July 2014. *See* Am. Compl. ¶¶ 36, 39, 67, 134–35; Pl.'s Opp'n at 12. The GSA does not dispute that those actions were protected activities, nor does it challenge the causation element. *See* Def.'s Mot. at 14–16. Because the GSA focuses its challenge exclusively on the second element, the Court will assess only whether Cogdell has pleaded an adverse action. *See Cohen v. Bd. of Trustees of the Univ. of the D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists." (quoting 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2015)).

Cogdell argues that the same actions underlying his discrimination claim—except for the GSA not informing him about the job vacancy—are adverse actions supporting his retaliation claim. *See* Pl.'s Opp'n at 12. He also adds another action: the GSA's delay in deciding his June 2014 accommodation request. *See id.* at 12–13. "In the retaliation context, an adverse action is one that is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Lurensky*, 167 F. Supp. 3d at 16 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). That standard "encompass[es] a broader sweep of actions" than the analogous requirement for discrimination claims. *Bridgeforth v. Jewell*, 721 F.3d 661, 663 n.* (D.C. Cir. 2013) (alteration in original) (citation omitted). Nevertheless, "'[a]ctionable retaliation claims are limited to those where an employer causes *material* adversity,' and the plaintiff still must suffer some objectively tangible harm." *Lurensky*, 167 F. Supp. 3d at 16 (quoting *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); and then citing *Allen v. Napolitano*, 774 F. Supp. 2d 186, 199 (D.D.C. 2011)).

Once again, most of the actions Cogdell points to were not adverse actions.  As discussed earlier, Cogdell does not allege any facts to show that he suffered objectively tangible harm as a result of the GSA denying him counseling under Executive Order 13,548, *see* Am. Compl. ¶¶ 39–45, the GSA requiring him to conduct an audit of his leave accounting while he was on FMLA leave, *see id.* ¶ 78, or the GSA prohibiting him from entering GSA office space for a day, *see id.* ¶¶ 73–74.  Because Cogdell's amended complaint lacks allegations showing that these actions harmed him in any material way, they cannot be predicates for his retaliation claim.  *See Lurensky*, 167 F. Supp. 3d at 19 (dismissing retaliation claim because plaintiff did not allege that reassignment caused her "any material harm").

Similarly, Cogdell does not plead enough facts about the voluntary leave transfer program to make it plausible that he could recover for the GSA's failure to tell him about it.  He says he had to use unpaid leave because he did not know about the program.  But he has not alleged facts indicating that, had he known about the program, he could have in fact used donated leave to cover his December absences.  Without information about the program's requirements or how the program works, it is uncertain whether the GSA's omission caused him material adversity.  Cogdell has therefore not met his burden to set forth "allegations plausibly suggesting" liability as opposed to allegations that are "merely consistent with" it.  *See Twombly*, 550 U.S. at 557; *cf. Ramsey v. Moniz*, 75 F. Supp. 3d 29, 54 (D.D.C. 2014) (granting summary judgment when plaintiff "allege[d] that she was placed on 'leave restriction'" but failed to "provide any context regarding the restriction or any evidence to conclude that it would have dissuaded a reasonable employee from pursuing an EEO claim").

The GSA's delay in responding to Cogdell's accommodation request also did not cause him material adversity.  It may be that an employer's unreasonable delay in accommodating an

employee can constitute an adverse action for purposes of making out a retaliation claim.  *Cf.*
*Mogenhan*, 613 F.3d at 1168 (explaining that "there are certain circumstances in which a 'long-
delayed accommodation could be considered' unreasonable and hence 'actionable'" as a failure-
to-accommodate claim (quoting *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d
364, 368 (D.C. Cir. 2007), *abrogated on other grounds by Green v. Brennan*, 136 S. Ct. 1769
(2016))).  But the delay must cause "objectively tangible harm" from the perspective of a
reasonable employee in the plaintiff's shoes; "trivial harms" will not do.  *Lurensky*, 167 F. Supp.
3d at 16; *see also Wiley*, 511 F.3d at 161.

Cogdell has not made a showing of objectively tangible harm.  The expert report he
attaches to his complaint says that the delay "caused [him] significant anxiety, stress, and
uncertainty in [his] professional position, and affected his mental stability," which, "in turn, . . .
caused a decrease in his job performance."  Koehler Report at 9.  Those consequences are largely
the kinds of "'purely subjective injuries, such as . . . public humiliation, or loss of reputation,
[that] are not adverse actions' in this Circuit" when lacking an associated concrete (often
financial) harm.  *See Lurensky*, 167 F. Supp. 3d at 20 (omission and alteration in original)
(quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006)).  For instance, the D.C. Circuit
has explained that threatened suspensions that "tarnish[] [an employee's] reputation and cause[]
emotional distress" are not materially adverse unless the employer carries out its threats and
withholds the employee's salary.  *See Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir.
2008).  Similarly, reprimands and poor performance reviews "typically constitute adverse actions
only when attached to financial harms" such as a negative impact on the employee's "position,
grade level, salary, or promotion opportunities."  *Id.*; *see also Allen*, 774 F. Supp. 2d at 202.
Cogdell's allegation that his job performance declined gets his complaint closer to stating a

plausible claim, but, even then, he does not explain how that decline led to any consequence on, say, his salary or grade level.  *See Allen*, 774 F. Supp. 2d at 200 (explaining that employer's failure to clarify expectations for work assignments, which made employee feel "severely stressed[,] . . . harassed, disenfranchised, and victimized," was not plausibly an adverse action because the employee did not provide "allegations of tangible harm" (internal quotation marks omitted)).[10]  Having failed to point to an objectively tangible harm resulting from the delay, Cogdell cannot show that the GSA taking less than three months to resolve a request for five different accommodations would deter a reasonable employee from reporting discrimination.  *Cf. Carroll v. England*, 321 F. Supp. 2d 58, 71 (D.D.C. 2004) ("[W]hile the Navy never justifie[d] its seven-week delay in answering [the plaintiff's] request . . . , the delay does not constitute an adverse employment action because [she] fail[ed] to identify 'objectively tangible harm' resulting from the delay." (citation omitted)).

   That leaves the GSA's denial of Cogdell's advanced sick leave request.  Just as that deed formed the basis of a plausible discrimination claim, so too was it materially adverse enough to sustain a retaliation claim.  As described above, Cogdell's request was for a significant period of time and, because the GSA denied it, his salary fell to $203 per month.  *See Lurensky*, 167 F. Supp. 3d at 17–18.  A denial of a request for several weeks of advanced sick leave that costs an

---

[10] In *Allen*, the plaintiff also alleged that her employer excluded her from meetings that "were relevant to her duties and . . . essential to her job." 774 F. Supp. 2d at 199.  She "identified and described in detail the alleged purpose of each meeting where she believed her exclusion was retaliatory . . . ." *Id.* at 199–200.  The court found that the plaintiff had pleaded a materially adverse action because, "[b]eyond feeling humiliated and embarrassed, [she] claims that she was deprived of information critical to her duties and thus that her exclusion interfered with her job performance." *Id.* at 199.  Cogdell has also alleged a decline in his job performance, but he has not provided nearly as much detail as to exactly how the GSA's delay in addressing his accommodation request caused his decline.  And even the *Allen* court noted that the plaintiff there "should have articulated the tangible harm or injury that she suffered with greater specificity." *Id.* at 200.

employee a significant portion of his monthly salary is an action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *See White*, 548 U.S. at 57.  The GSA's denial of Cogdell's request was thus an adverse action.  And because the GSA does not dispute causation, the claim survives dismissal.

### F.  Cogdell's Constructive Discharge Allegation

The last item warranting discussion is Cogdell's allegation that the GSA constructively discharged him.  Cogdell asserts that the agency forced him out by not providing him with the support he needed to do his job.  Pl.'s Opp'n. at 13–14.  According to his complaint, he was unable to complete his job functions after returning to work in January 2015 because the agency did not reasonably accommodate his disabilities, the agency gave him a job for which he was not trained, and his supervisor offered him little assistance.  Am. Compl. ¶ 103.  Cogdell claims he was "effectively terminated" by July 2015, *id.* ¶ 108, when he stopped working and, soon thereafter, stopped receiving a salary, *id.* ¶ 105.  He applied for a disability retirement annuity in December of that year, *id.* ¶ 106, and left the GSA at the end of February 2016, *id.* ¶ 15.

"[A] constructive discharge occurs where the employer creates or tolerates discriminatory working conditions that would drive a reasonable person to resign."  *Robinson v. Ergo Sols., LLC*, 85 F. Supp. 3d 275, 283 (D.D.C. 2015) (quoting *Taylor v. F.D.I.C.*, 132 F.3d 753, 766 (D.C. Cir. 1997)).  There is some dispute in this district over whether constructive discharge can be a standalone cause of action.  *Compare, e.g.*, *Robinson-Reeder v. Am. Council on Educ.*, 532 F. Supp. 2d 6, 17 (D.D.C. 2008) ("An allegation of constructive discharge arising out of discriminatory employment actions may, in proper circumstances, constitute an independent claim for recovery . . . ."), *aff'd*, 417 F. App'x 4 (D.C. Cir. 2011), *with, e.g.*, *Owens-Hart v. Howard Univ.*, 220 F. Supp. 3d 81, 97 (D.D.C. 2016) ("[C]laims of constructive discharge are

not stand-alone causes of action."). But regardless, Cogdell's complaint "does not plead constructive discharge as a separate count." *Richardson v. Petasis*, 160 F. Supp. 3d 88, 127 (D.D.C. 2015); *see also* Pl.'s Opp'n at 3 (Cogdell acknowledging that he may not have alleged sufficient facts for a standalone constructive discharge claim). Instead, Cogdell invokes constructive discharge as "an assertion ultimately relating to the scope of [his] potential recovery in the event that []he prevails on the claims of discrimination or retaliation." *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 73–74 (D.D.C. 2006). In other words, he wants to be able to collect compensation that he would have earned had he kept his job. *See id.* at 74; *see also* Pl.'s Opp'n at 3, 13–14.

Constructive discharge requires Cogdell to show that "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that []he had no option but to end h[is] employment." *Cole v. Powell*, 605 F. Supp. 2d 20, 25 (D.D.C. 2009) (quoting *Turner v. District of Columbia*, 383 F. Supp. 2d 157, 171 (D.D.C. 2005)). "'Aggravating factors' are those aspects of a discriminatory work environment that, by making the workplace so disagreeable, prevent the reasonable employee from seeking remediation on the job." *Richardson*, 160 F. Supp. 3d at 127 (quoting *Veitch v. England*, 471 F.3d 124, 130 (D.C. Cir. 2006)). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).

Cogdell has pleaded enough facts for his constructive discharge allegation to survive a motion to dismiss. He alleges that the GSA tasked him with a job that he was unequipped for and refused to provide him the accommodation that would have enabled him to succeed. As a result, Cogdell says he had to stop working and quickly used up what little paid leave he had

left—which, if he is right about the advanced sick leave denial, may have been less than he was owed.  Taking those allegations as true, it is plausible that a reasonable person in his position would have felt compelled to resign.  The Court will thus deny the GSA's motion to dismiss Cogdell's constructive discharge allegation.  *See Owens-Hart*, 220 F. Supp. 3d at 98 (denying employer's summary judgment motion on constructive discharge issue when employee resigned after her employer refused to accommodate her disability for years); *see also Hammel v. Marsh USA Inc.*, 79 F. Supp. 3d 234, 246 (D.D.C. 2015) (dismissing constructive discharge standalone claims but permitting plaintiff to allege constructive discharge for purposes of recovery).

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion to amend is **GRANTED** and Defendant's motion to dismiss or, alternatively, motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 20, 2020                                    RUDOLPH CONTRERAS
                                                            United States District Judge