**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LELAND L. COGDELL, JR., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-2462 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 52, 53 |
| | : | | |
| ROBIN CARNAHAN, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING IN PART AND
DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiff Leland L. Cogdell, Jr. ("Plaintiff" or "Cogdell") brings the instant action against

Robin Carnahan in her official capacity as the Administrator of the U.S. General Services

Administration (the "GSA"),[1] alleging violations of the Rehabilitation Act of 1973 (the

"Rehabilitation Act"), 29 U.S.C. §§ 791–794f.  In a prior opinion, this Court granted in part and

denied in part the GSA's motion seeking dismissal of or summary judgment on Cogdell's

Amended Complaint, such that three of Cogdell's claims remained.  *Cogdell v. Murphy*, No. 19-

cv-2462, 2020 WL 6822683, at *1 (D.D.C. Nov. 20, 2020).  Cogdell now moves for partial

summary judgment on his claim that the GSA failed to accommodate his disability when it

denied his request for a job coach.  *See generally* Pl.'s Mem. P. & A. Supp. Mot. Summ. J.

---

[1] Cogdell initially brought suit against the then-GSA Administrator Emily W. Murphy.
Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes the current GSA
Administrator, Robin Carnahan, for former Administrator Murphy in her official capacity.
Because Cogdell is suing Administrator Carnahan in her official capacity as the GSA's
Administrator, this opinion will refer to Defendant as "the GSA."

("Pl.'s Mot. Summ. J."), ECF No. 52.  The GSA cross-moves for summary judgment on all of Cogdell's claims, including his claims that the GSA discriminated and retaliated against him when it rejected his request for advanced sick leave.  *See generally* Def.'s Mem. P. & A. Supp. Cross-Mot. Summ. J. and Opp'n to Pl.'s Mot. Partial Summ. J. ("Def.'s Cross-Mot. Summ. J."), ECF No. 53-1.  For the reasons explained below, the Court denies Cogdell's motion for partial summary judgment and grants in part and denies in part the GSA's cross-motion for summary judgment.

## BACKGROUND

In cross-moving for summary judgment, the parties agree on certain material facts.  The Court recounts those that the parties do not dispute, while noting specific disagreements about others and referring to the record as needed.[2]

### A.  Factual Background

Cogdell worked at the GSA for almost fifteen years, from his initial hiring in July 2001 until approval of his disability retirement in February 2016.  *See* Def.'s Combined Statement of Undisputed Material Facts and Response to Pl.'s Statement of Material Facts ("Def.'s SMF") ¶ 3, ECF No. 53-2; Pl.'s Resp. to Def.'s SMF ¶ 102, ECF No. 56-1.  During his tenure at the GSA, Cogdell suffered from a variety of mental health problems that caused substantial limitations, including autism spectrum disorder, a learning disability, post-traumatic stress disorder ("PTSD"), attention-deficit/hyperactivity disorder ("ADHD"), obsessive compulsive disorder, and mixed personality disorder.  *See* Def.'s SMF ¶¶ 1–2.

---

[2] The Court relies on the ECF-generated page numbers when citing to docketed materials that are not paginated consistently, such as exhibits.

In April 2014, the GSA assigned Cogdell to be an Internal Communications Specialist. *Id.* ¶ 8.  David Lee Wycinsky, Jr. served as Cogdell's first-line supervisor, while Mafara Lynn Hobson served as his second-line supervisor.  *Id.* ¶¶ 13–14.  Cogdell claims that the job, which "require[d] almost-daily deadlines," Am. Compl. ¶ 81, ECF No. 25, "was outside of [his] skill set[ ] due to his developmental disabilities," Pl.'s Statement of Undisputed Material Facts ("Pl.'s SMF") ¶ 9, ECF No. 52-1.  On July 8, 2014, Cogdell submitted an accommodation request through his cognitive therapist, Dr. Catherine Lee.  Def.'s SMF ¶¶ 15–16; Ex. 19 to Def.'s Cross-Mot. Summ. J., ECF No. 53-22.  In a letter dated June 27, 2014, Dr. Lee recommended that the GSA provide Cogdell with seven accommodations:

- The assignment of work that matches Mr. Cogdell's skill set and interests, and which allows him to feel that he is making a difference for the agency.
- On the days that Mr. Cogdell is required to work at the GSA Central Office, the assignment of a "quiet room" with the minimum of distractions, preferably a room with a door, floor-to-ceiling walls, and adequate lighting and ventilation.
- Noise-cancelling headphones to further block hallway noise.
- Job assignments to be broken down into smaller pieces to prevent Mr. Cogdell from becoming overwhelmed.
- Extra time to complete tasks, especially when the work requires learning new skills or working with new people.
- Regular feedback (preferably quarterly) that specifically targets areas in need of improvement and expected performance at each one of the performance rating levels.
- A job coach (for at least the next 90 days) to assist Mr. Cogdell in re-acclimation to the workforce after his extended sick leave, training on Google software used by the agency, and the development of skills to improve organization and focus.

Ex. 17 to Def.'s Cross-Mot. Summ. J. at 2–3, ECF No. 53-20; Def.'s SMF ¶ 17.

In a decision letter dated September 16, 2014, the GSA granted all of Cogdell's accommodation requests except for the job coach.  *See* Ex. 31 to Def.'s Cross-Mot. Summ. J. at

3–4, ECF No. 53-34.[3]   The GSA did, however, provide links to various online training platforms and videos.  *See id.*; Def.'s SMF ¶ 28.  "[I]n lieu of the job coach [Cogdell] requested," the GSA also offered to "make available to [Cogdell] other technology solutions and online training related to time management [and] organizational development."  Ex. 31 to Def.'s Cross-Mot. Summ. J. at 4.  The GSA's decision letter stated that, within 45 business days of the decision, Cogdell would be expected to provide Wycinsky with a log of the training and technology tools provided by the GSA that Cogdell used.  *Id.* at 5.  It also advised Cogdell that he could request reconsideration of the decision "within seven (7) business days from receipt" of the decision.  *Id.* Wycinsky sent the decision letter to Cogdell on September 16, 2014.  *See* Ex. 30 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-33.  In a subsequent email to Cogdell, Wycinsky explained that "GSA does not really use 'job coaches' as defined in [Cogdell's] request," so the GSA had to, "as was laid out" in the decision letter, meet Cogdell's accommodations request "though other methods."  Ex. 32 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-35.

Cogdell did not watch any of the videos.  Cogdell Dep. Tr., Ex. 1 to Def.'s Cross-Mot. Summ. J. at 153:4–6, ECF No. 53-4.  He appears to claim that he tried accessing one of the links, but found that the link led only to an error message.  *Id.* at 153:13–16.  Cogdell alleges that he "likely" brought up the issue of the broken link with Wycinsky "shortly thereafter," *id.* at 153:25, 154:5, but "did not spend a lot of time on that broken link," *id.* at 155:10–11.  The GSA disputes that any of the links did not work and asserts that Cogdell did not inform the GSA that a link did not work because its Office of Information Technology would have been able to help him had it

---

[3] The GSA's decision letter also noted, but denied, Cogdell's accommodations request for a reassignment to the Office of Human Resources Management, Office of Human Capital Management, Diversity Programs.  *See* Ex. 31 to Def.'s Cross-Mot. Summ. J. at 3, 5.

been made aware of a problem.  *See* Def.'s Verified Interrog. Resps., Ex. 8 to Def.'s Cross-Mot. Summ. J.  at 25, ECF No. 53-11.

On September 25, 2014, Cogdell submitted a request for reconsideration to Hobson. Def.'s SMF ¶ 34.  Dr. Lee's letter accompanying Cogdell's request averred that, while "the online training suggested in the decision letter might be beneficial for most employees, it is typically not appropriate for individuals diagnosed with ADHD who have difficulty with organization, time management, prioritizing, and shifting from one assignment to another."  Ex. 33 to Def.'s Cross-Mot. Summ. J. at 3, ECF No. 53-36.  In addition, Dr. Lee furnished a revised recommendation that Cogdell be provided access to a job coach "one hour a week for at least 39 weeks."  *Id.*  The GSA does not dispute that Hobson never made a decision on Cogdell's request for reconsideration.  Def.'s SMF ¶ 35.  But the GSA alleges that Cogdell did not follow up with Hobson regarding the request for consideration, and that Hobson simply forgot about the request as she dealt with his subsequent accommodation requests.  *Id.* ¶ 87.  Cogdell contests these assertions.  *See* Pl.'s Resp. to Def.'s SMF ¶ 87.

On October 29, 2014, Cogdell requested an accommodation to telework full-time.  Pl.'s Resp. to Def.'s SMF ¶ 88.  In response, via a letter dated November 3, 2014, the GSA sought additional medical information "to determine what changes [had] occurred with [his] medical condition that [made] the recently granted accommodations no longer effective to meet [his] limitation needs." Ex. 36 to Def.'s Cross-Mot. Summ. J.  at 2, ECF No. 53-39.  Apparently in reference to the letter, on November 4, 2014, Cogdell emailed Wycinsky and other GSA employees, stating in part:

> Your email from late last week and Octavia's email of late yesterday afternoon have left me extremely upset and in a very fragile state . . . . Should I decide to give up all my hopes and dreams in this life because I finally determined that this perfect storm of GSA's treatment became just too unbearable for me, then it can expect to be held liable

for contributory negligence in the U.S. District Court for the District of Columbia. Our retained counsel has instructions on how to proceed to protect my wife and young twin boys, should I be no more.

Ex. 37 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-40. Concerned about Cogdell's well-being, and after consultation with the GSA's Office of Human Resources Management and Office of Mission Assurance, Wycinsky contacted the Federal Protective Service, which in turn contacted the Howard County, Maryland Police Department, which then sent an officer to Cogdell's house. Pl.'s Resp. to Def.'s SMF ¶ 90.

Later that evening, Wycinsky informed Cogdell via email that the GSA had decided to place him on administrative leave for one day, on November 5, 2014, as it "sort[ed] out a new decision on [his] latest reasonable accommodation request." Ex. 38 to Def.'s Cross-Mot. Summ. J. at 2. The GSA granted Cogdell's October 29, 2014 request for full-time telework on November 7, 2014. Pl.'s Resp. to Def.'s SMF ¶ 90. On November 17, 2014, Cogdell emailed Wycinsky to inform him that he would be out sick that day, commenting that Wycinsky should "[p]lease refrain from requesting that any law[] enforcement officer be dispatched to [his] private residence" and that "[Wycinsky's] actions on November 4, 2014 were considered to be harassment and very upsetting to [his] wife and [him]." *Id.* ¶ 92; Ex. 41 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-44.

On November 26, 2014, Cogdell requested two additional accommodations: (1) that he be given extra time to complete work tasks, and (2) that the deadlines to complete online training videos be removed. *See* Ex. 42 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-45; Pl.'s Resp. to Def.'s SMF ¶ 93. Noting that Cogdell had "recently" been diagnosed with PTSD, Dr. Lee advised that "granting him six to eight weeks of administrative leave or a significant advance on sick leave would allow . . . Cogdell the time to have his medication titrated and learn to

overcome his new diagnoses and the many symptoms they present on a daily basis." Ex. 42 to Def.'s Cross-Mot. Summ. J. at 2–3.

Then, on December 7, 2014, Cogdell requested either eight weeks of administrative leave under the Family and Medical Leave Act ("FMLA") or four weeks of administrative leave and an advance on his sick leave balance of 240 hours. Ex. 43 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-46. Specifically, Dr. Lee's certification of Cogdell's health condition averred that he would be unable to perform his essential job functions between December 8, 2014 and February 2, 2015. *See id.* at 4–5. Dr. Lee's email to Wycinsky attaching her certification stated that Cogdell "ha[d] shared with [her] than he plan[ned] to return to work." *Id.* at 2. But Dr. Lee also advised that "[t]he amount of time needed to recover enough to return to work is just an estimate right now," given that "[t]here are many factors involved in his rather complex medical situation." *Id.* Similarly, the certification stated:

> It is impossible to predict the duration of related incapacity [Cogdell] may have over the next [six] months, as the duration of symptoms varies . . . The emergency request for FMLA is necessary to allow for more intensive treatment over the next [eight] weeks without the stress of workplace triggers.

*Id.* at 5.

On December 19, 2014, Wycinski responded to Cogdell's request for leave, explaining that, given Cogdell's use of leave earlier that year, Cogdell would exhaust his 480 hours of FMLA leave on December 29, 2014. Ex. 44 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-47. Wycinski further stated that he would forward Cogdell's request for advanced sick leave to Hobson, who would issue a decision on the issue, and that he expected Cogdell to return to work status on February 3, 2015. *Id.* at 3. On December 30, 2014, Hobson denied Cogdell's request for advanced sick leave, explaining that GSA's Time and Leave Administration Policy required that "there must be a reasonable expectation that the employee will return to work upon recovery

from the illness." Ex. 45 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-48.  "Based on the medical certification" that Cogdell had provided, Hobson said, "there [was] not a reasonable expectation that [Cogdell would] be returning to work." *Id.*

But on December 31, 2014, Cogdell emailed Wycinsky to advise him that he had returned to duty status, describing Hobson's denial of the request for advanced sick leave as "some twisted and diabolical attempt to stop [his] income" so that he would lose his home and would not be able to telework anymore.  Ex. 46 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-49.  In early January, Wycinsky expressed his "surprise" at Cogdell's email stating that he had returned to work, considering that Dr. Lee had certified that Cogdell would need to be on leave for eight weeks.  Ex. 47 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-50.  Given the "conflicting information," Wycinsky said, he would need an "updated medical certification from [Cogdell's] health practitioner stating [Cogdell is] able to return to work and perform the duties of [his] position . . . ." *Id.*  Three days later, Dr. Lee recommended that Cogdell return to full-time work "with the reasonable accommodations previously approved and the two additional ones requested."  Ex. 48 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-51.

On January 15, 2015, Wycinsky granted another of Cogdell's requests, submitted on December 30, 2014, seeking 80 hours of advanced annual leave.  Ex. 49 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-52.  In February 2015, Wycinsky also denied in part Cogdell's November 26, 2014 request.  Ex. 50 to Def.'s Cross-Mot. Summ. J. at 2, ECF No. 53-53. Although he granted Cogdell's request that the deadlines for completing the online training be eliminated, he denied the request for extra time to complete work assignments, stating that Cogdell had not been in a work status for a sustained period of time necessary for assessing the effectiveness of the accommodations previously granted in September.  *Id.* at 3.

Beginning January 2015, Cogdell was unable to complete his functions, Pl.'s Resp. to Def.'s SMF ¶ 101, because, according to Cogdell, he was not properly accommodated, the job was one he was not trained for, and his supervisor gave "sparing assistance," Am. Compl. ¶ 103. He stopped working in July 2015, *id.* ¶ 104, and his disability retirement was approved on February 29, 2016, Pl.'s Resp. to Def.'s SMF ¶ 102.

### B.  Procedural Background

Cogdell filed the original Complaint in this matter on August 14, 2019, Compl., ECF No. 1, but the Court then granted his subsequent motion to amend the Complaint, *Cogdell*, 2020 WL 6822683, at *1 n.2.  As a result of the Court's previous opinion, which granted in part and denied in part the GSA's motion to dismiss or, alternatively, motion for summary judgment, three of Cogdell's claims under the Rehabilitation Act remain: (1) that the GSA failed to accommodate his disability when it denied him a job coach, and (2) that the GSA discriminated and (3) retaliated against him when it rejected his request for advanced sick leave.  *Id.* at *1.  Cogdell has moved for partial summary judgment, only seeking summary judgment on his failure-to-accommodate claim.  *See generally* Pl.'s Mot. Summ. J.  The GSA opposes Cogdell's motion and has also cross-moved for summary judgment on all of his claims.  *See generally* Def.'s Cross-Mot. Summ. J.  Cogdell filed an opposition to the GSA's cross-motion, *see generally* Pl.'s Opp'n to Def.'s Cross-Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 56, and the GSA replied, *see generally* Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 57.  The pending motions are now ripe for consideration.

### LEGAL STANDARD

Summary judgment is appropriate only where the summary judgment "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  A "material" fact is one "capable of affecting the substantive outcome of the litigation," and there is a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *McMullen v. Synchrony Bank*, 300 F. Supp. 3d 292, 300 (D.D.C. 2018) (citation omitted).  The party "asserting that a fact cannot be or is genuinely disputed must support the assertion" by: (1) "citing to particular parts of materials in the record," or (2) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In deciding a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *McMullen*, 300 F. Supp. 3d at 300 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Thus, to defeat a motion for summary judgment, "an opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Id.*  Where "the non-movant's evidence is 'merely colorable' or 'not significantly probative,' summary judgment may be granted." *Id.* (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249–50).  The Court must, however, "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007).

"When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).  "[T]he [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting

*Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).  "If the Court determines that one party is not entitled to summary judgment, it 'changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent.'"  *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018) (quoting *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 998 (N.D. Ill. 2017)).  "It is nonetheless still possible for a court to deny summary judgment to both sides."  *Id.*  "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion."  *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (citation omitted).

## ANALYSIS

Cogdell raises three claims under the Rehabilitation Act: (1) that the GSA failed to accommodate his disability when it denied him a job coach, and (2) that the GSA discriminated and (3) retaliated against him when it rejected his request for advanced sick leave.  Genuine disputes of material fact preclude summary judgment for both parties on Cogdell's failure-to-accommodate claim, but the Court grants the GSA's cross-motion for summary judgment as to Cogdell's discrimination and retaliation claims.

### A.  Failure to Provide Reasonable Accommodation

Under the Rehabilitation Act, federal agencies must provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." 42 U.S.C. § 12112(b)(5)(A) (ADA provision); 29 U.S.C. § 791(f) (incorporating ADA standards into the Rehabilitation Act).[4]  An employer's "refusal to provide a

---

[4] "Due to the substantial similarity between the Rehabilitation Act and the Americans with Disabilities Act ("ADA"), cases interpreting the ADA are equally applicable when

reasonable accommodation when one is requested violates the Rehabilitation Act regardless of whether the employer harbors animus or otherwise intends to discriminate against the employee." *Drasek v. Burwell*, 121 F. Supp. 3d 143, 155 (D.D.C. 2015).

To establish a failure-to-accommodate disability discrimination claim, Cogdell must establish four elements: (1) that he was an individual with a disability; (2) that the GSA had notice of the disability; (3) that he could perform the essential functions of his position with reasonable accommodation; and (4) that the GSA refused to make reasonable accommodations. *See, e.g.*, *id.*; *Doe v. Garland*, No. 18-cv-4, 2021 WL 4502038, at *5 (D.D.C. Sept. 30, 2021). The plaintiff must prove each element by a preponderance of the evidence unless the employer "invokes the affirmative defense of undue hardship," in which case "the burden shifts to the employer to prove that the affirmative defense applies." *Drasek*, 121 F. Supp. 3d at 155.

### 1. Reasonable Accommodation

The GSA denies that it refused to make a reasonable accommodation.  It argues that the GSA provided Cogdell with reasonable accommodations by "granting him six of the seven accommodations requested." Def.'s Cross-Mot. Summ. J. at 17.  The GSA was not required to provide the job coach as Cogdell specifically requested, it contends, because it provided him with "significantly more accommodations than what [is] typically granted for ADHD," *id.* at 20, and the denial of the job coach ought not be considered in isolation, *see id.* at 22.

As the Court has previously recognized in this matter, "[i]t is true that '[a]n employer is not required to provide an employee that accommodation he requests or prefers, [as] the employer need only provide some reasonable accommodation.'" *Cogdell*, 2020 WL 6822683, at

---

analyzing a claim under the Rehabilitation Act." *Tyson v. Brennan*, 277 F. Supp. 3d 28, 36 n.9 (D.D.C. 2017), *aff'd*, No. 18-5033, 2018 WL 5927921 (D.C. Cir. Nov. 7, 2018).

*6 (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1305 (D.C. Cir. 1998)).  Consistent with the GSA's urging of this Court to consider all of the accommodations that the GSA granted Cogdell in the aggregate, some courts have looked to the totality of the circumstances and "consider[ed] whether the combination of accommodations provided by the employer was reasonable." *Hamilton v. Prince George's Cnty. Police Dep't*, No. 17-cv-2300, 2018 WL 1365847, at *8 (D. Md. Mar. 16, 2018) (citation omitted); *see also Scarborough v. Natsios*, 190 F. Supp. 2d 5, 25 (D.D.C. 2002), *dismissed*, No. 02-5160, 2002 WL 1560032 (D.C. Cir. July 16, 2002) ("A court must look to the facts surrounding a request for accommodation to determine whether it is reasonable."); *Horodner v. Midwestern Univ.*, No. CV-20-01800-PHX-JAT, 2020 WL 7643198, at *3 (D. Ariz. Dec. 23, 2020) ("A court determining whether a requested accommodation is reasonable must do so based on the totality of circumstances.").  And because "[d]etermining whether a particular type of accommodation is reasonable is commonly a contextual and fact-specific inquiry," *Solomon v. Vilsack*, 763 F.3d 1, 9 (D.C. Cir. 2014), there is no guidance as to whether an employer must provide a job coach as an accommodation in every case.  Some courts have, however, observed that the provision of a job coach may be unreasonable if the coach would be required "on a permanent or indefinite basis."  *E.E.O.C. v. Dollar Gen. Corp.*, 252 F. Supp. 2d 277, 292 (M.D.N.C. 2003); *see also E.E.O.C. v. Hertz Corp.*, No. 96-72421, 1998 WL 5694, at *5 (E.D. Mich. Jan. 6, 1998) (deeming having "a full-time job coach to assist in the performance of job duties on a permanent basis" to be unreasonable).

Considering the record here, the determination of whether the GSA failed to provide a reasonable accommodation when it denied Cogdell his request for a job coach presents a genuine disputed issue of fact that is material to Cogdell's failure-to-accommodate claim—and, as a result, summary judgment for either party is precluded.  *See, e.g.*, *Hartzler v. Mayorkas*, No. 20-

cv-3802, 2022 WL 15419995, at *12 (D.D.C. Oct. 27, 2022) ("[W]hether a requested

accommodation is reasonable is typically a question of fact for the jury, to be decided based on

all the circumstances of the case." (citation omitted and cleaned up)).  The parties have each

offered differing expert opinions on Cogdell's need for a job coach and the reasonableness of the

alternative accommodations provided by the GSA.  On the one hand, Dr. Lee has written that she

"stand[s] by" her decision to recommend a job coach for Cogdell, "given the extreme severity of

his ADHD symptomatology and the risk it placed for losing his job."  Lee Expert Witness Report

at 2, ECF No. 52-2.  The GSA's "offer of computer software" to Cogdell in lieu of a job coach

was also "an ill-advised accommodation," she opines, because "the videos were developed for

the 'normal population' of employees"; there was no personalization of the program to Cogdell's

disability; there was no interactive way for Cogdell to request and receive feedback; and the

assignment of videos increased Cogdell's workload, leading to additional stress.  *Id.* at 2.[5]

On the other hand, Dr. Lee's assessments did not limit the duration of time that Cogdell

would need the job coach, initially asking for a job coach "for at least the next 90 days," Ex. 17

to Def.'s Cross-Mot. Summ. J. at 3, and then later revising the request to "one hour a week for at

least 39 weeks," Ex. 33 to Def.'s Cross-Mot. Summ. J. at 3.  The language of the requests seems

to leave open the possibility that the job coach would be required on an indefinite basis, which

might render the request unreasonable.  *See Dollar Gen. Corp.*, 252 F. Supp. 2d at 292.

---

[5] The GSA argues that Cogdell's experts, including Dr. Lee, based their assessments on
the efficacy of the training videos on the incorrect premise that the videos were not interactive.
Def.'s Cross-Mot. Summ. J. at 22–23.  Given that Dr. Lee identifies the lack of interactivity as
only one of various reasons why the GSA's training videos would not be effective in meeting
Cogdell's needs, the GSA's contention that some of the videos were in fact interactive does not
discredit Dr. Lee's opinion in whole, but may instead be considered by the jury in assessing the
weight of her opinion.

Further, the GSA's own expert witness, Dr. O'Rourke, wrote after examining Cogdell that he "[could not] support the conclusion that [Cogdell] meets criteria for an autism spectrum disorder or posttraumatic stress disorder," and also "[could not] confirm or disconfirm the presence of a mood disorder or ADHD due to Mr. Cogdell's invalid symptom reporting." O'Rourke Neuropsychological Report at 23, ECF No. 52-3.  Concluding that it was "more likely than not that [Cogdell's] self-reported symptoms [were] exaggerated," and noting that Cogdell had "successfully completed several career and school transitions throughout his life without the assistance of a job coach," O'Rourke found that the exam "[did] not indicate that a job coach is a reasonable or necessary accommodation for Mr. Cogdell to function in the workplace." *Id.* at 24. O'Rourke further stated that "[t]he accommodations previously offered to Mr. Cogdell [were] appropriate (i.e., a quiet room for him to work in, noise-canceling headphones, extra time to complete assignments, regular feedback on his work)." *Id.*

But yet another expert hired by Cogdell, Dr. Mack, described Dr. O'Rourke's report as "limited" because it "refer[red] only to the mental health status of Ted Cogdell in the present time, rather than his state in the past" during the time period at issue in the case.  Mack Report on Neuropsychological Report at 22, ECF No. 52-4.  Submitting that Dr. O'Rourke's report lacked specificity in not defining a job coach, Dr. Mack also found Dr. O'Rourke's reasoning as to why Cogdell would not benefit from a job coach to be insufficient and "at best speculative." *Id.* at 25.

Previously, the Court denied the GSA summary judgment on Cogdell's failure-to-accommodate claim in part because the GSA did not support with evidence its contention that the training videos reasonably accommodated Cogdell.  *Cogdell*, 2020 WL 6822683, at *6. Now, the GSA has provided an expert report that challenges the medical opinions that Cogdell has offered and opines not only that a job coach was not a reasonable or necessary

accommodation, but also that the accommodations the GSA did offer were sufficient.  Such "[c]onflicting expert reports create a genuine issue of material fact which precludes summary judgment." *D.B. v. Tredyffrin/Easttown Sch. Dist.*, No. 17-cv-2581, 2020 WL 6262181, at *10 (E.D. Pa. Oct. 23, 2020) (quoting *U.S. Airways v. Elliot Equipment Co.*, No. 06-1481, 2008 WL 4461849, at *2 (E.D. Pa. Sept. 29, 2008)); *see also, e.g.*, *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 143 (S.D.N.Y. 2022) ("Summary judgment is not favored in cases involving materially conflicting expert reports." (citation omitted)).

### 2.  Breakdown of Interactive Process

Each party also claims that the other caused a breakdown in the interactive process.  An employee's notification that he has a disability and his request for an accommodation trigger an "interactive process"—"'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'"  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).  Both parties must engage in this interactive process in good faith, and neither "should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability."  *Id.*  "When the interactive process breaks down, 'courts should attempt to isolate the cause of the breakdown and then assign responsibility' to the culpable party."  *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 42 (D.D.C. 2011) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000)).  An employer is not liable for denying an accommodation request if it participated "in good faith" in an "interactive process" aimed to satisfy the request.  *Ward*, 762 F.3d at 32.

Courts look for "signs of failure to participate in good faith."  *Id.* (citation omitted).  For example, employers may demonstrate good faith by "meeting with employees who request

accommodation, requesting information about the conditions and limitations the employees have, asking employees what they want, considering employees' requests, and offering or discussing available alternatives." *Morris v. Jackson*, 994 F. Supp. 2d 38, 47 (D.D.C. 2013). But a party that "obstructs or delays the interactive process" or "fails to communicate, by way of initiation or response," may be acting in bad faith. *Ward*, 762 F.3d at 32 (citation omitted).

In its prior opinion, the Court concluded that it appeared, viewing the facts in the light most favorable to Cogdell, that the GSA may have ended the interactive process or participated in the process in bad faith. *Cogdell*, 2020 WL 6822683, at *7. As the Court then noted, the GSA's decision denying Cogdell's request for a job coach "did not exactly suggest that the agency was willing to engage in an interactive process to ensure Cogdell was reasonably accommodated," and, perhaps most importantly, the GSA never even responded to Cogdell's request for reconsideration. *Id.* at *7–8. Rejecting the GSA's sole argument that Cogdell acted in bad faith by not trying the training videos, the Court pointed out that the GSA did not "cite any authority for the proposition that good-faith participation in the interactive process always requires trying an accommodation," though "complete refusal to attempt an employer's accommodations would be the sort of obstructive behavior indicative of bad faith." *Id.* at *8.

The GSA now argues once again that Cogdell caused the breakdown in the interactive process by "never even attempt[ing] to determine whether the [GSA's] offered accommodations would sufficiently address his disability" and never watching the training videos that the GSA provided. Def.'s Cross-Mot. Summ. J. at 36. Among the cases the GSA cites in support is *Lockett v. Bd. of Com'r of Cnty. of Allen*, No. 1:07-cv-270TS, 2009 WL 2750126 (N.D. Ind. Aug. 26, 2009), which involved a plaintiff, a maintenance worker for county highways, who contended that the defendants violated the ADA because they "did not make a good faith effort

to accommodate him when they tried to make him wear goggles instead of excusing him from operating a chain saw and other specified pieces of equipment that would create blowing dust or debris." *Id.* at *7. The court held the plaintiff responsible for the breakdown in the interactive process, however, and found that "it was reasonable for the Defendant to suggest that he try different eye wear for situations and tasks that the Plaintiff himself determined were too dusty." *Id.* at *8. Rejecting the plaintiff's argument that the defendants' proposed accommodation of different goggles was "obviously doomed to fail from the start," the court highlighted that the plaintiff had "only tried one pair of goggles before he determined that no personal protective equipment could provide sufficient protection without drying out his contact lenses" and "tried none of the equipment offered after the parties began the interactive process." *Id.* at *9. That is, while "the Defendants offered and took affirmative steps to supply other brands of eye wear and other types of protection (with no limit for financial cost)," he "refused to try this equipment while performing job duties, even those that he claimed were not problematic for the amount of dust they created." *Id.* Accordingly, the court concluded, the plaintiff "failed to make reasonable efforts to help the Defendants determine what accommodations would be effective and thereby caused the breakdown in the interactive process." *Id.*

Cogdell argues that *Lockett* is factually distinguishable, and further contends that the GSA caused the breakdown of the interactive process when it failed to respond to Cogdell's reconsideration request. Pl.'s Opp'n at 22–23. And indeed, the GSA does not dispute that Cogdell never received a decision on his request for reconsideration of the denial, simply alleging that, amidst the "flurry" of subsequent accommodations requests submitted by Cogdell, Hobson simply "forgot about [Cogdell's] September 25, 2014 request for reconsideration." Def.'s Cross-Mot. Summ. J. at 31. In support, the GSA cites only to Hobson's EEO

investigative affidavit, *id.*, which does not appear to say anything about Hobson forgetting that

Cogdell sought reconsideration of the decision, *see* Hobson Aff., Ex. 6 to Def.'s Cross-Mot.

Summ. J. ¶¶ 69–77.

The lack of response to the reconsideration request does not necessarily put an end to the

matter, however, considering that the GSA avers that it initially sought to understand Cogdell's

need for a job coach and how it could best accommodate him with its available resources, but

Cogdell's "adversarial approach caused the interactive process of inquiry to be non-productive"

as he "kept redirecting the inquiry to his demand for a reassignment."  Def.'s Am. Resps. to Pl.'s

Interrog. and Disc. Demands, Ex. 8 to Def.'s Cross-Mot. Summ. J. at 19–20, ECF No. 53-11.

Further, the record reflects that the GSA continued to engage with Cogdell after its denial—for

example, in February 2015, at Cogdell's request, the GSA removed the deadlines by which

Cogdell would be required to complete the online training videos.  *See* Ex. 50 to Def.'s Cross-

Mot. Summ. J. at 2.  Given that Cogdell himself sought more time to complete the videos, it

seems at least plausible that the GSA continued to expect that he would at least try the videos as

an alternative to the job coach.

"The evidence is conflicting and the issue regarding which party was responsible for the

breakdown in the interactive process is factual."  *Garcia v. Praxair, Inc.*, No. 1:18-cv-01493-

SAB, 2019 WL 7038387, at *14 (E.D. Cal. Dec. 20, 2019).  A reasonable jury could find that the

GSA caused the breakdown by failing to respond to Cogdell's request for reconsideration; in the

alternative, the jury could find that Cogdell's refusal to try the training videos, while

simultaneously requesting additional time from the GSA to complete them, was not in good

faith.  *See Clark v. Sch. Dist. Five of Lexington & Richland Ctys.*, 247 F. Supp. 3d 734, 751

(D.S.C. 2017) (finding genuine issue of material fact as to whether the defendant failed to engage

in interactive process where the defendant argued that the parties were unable to determine if a weighted vest was a reasonable accommodation because the plaintiff refused to try it).  A genuine issue of material fact exists, thus precluding summary judgment.

### 3.  Qualified Individual

Finally, the GSA questions whether Cogdell is even a "qualified individual" protected by the Rehabilitation Act, Def.'s Cross-Mot. Summ. J. at 25–26, defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires," *Ward*, 762 F.3d at 28 (citation omitted).  The GSA asserts that the Court should find that, like the plaintiff in *Miller v. Santa Clara Cnty. Libr.*, 24 F. App'x 762 (9th Cir. 2001), Cogdell is not a qualified individual.  In *Miller*, the Ninth Circuit concluded that the plaintiff-conservator's son was not a qualified individual under the ADA because he "[could not] perform without a job coach at his elbow" and "[did] not have the basic, rudimentary knowledge required for library work."  24 F. App'x at 765.  "Reasonable accommodation," it stated, did not include "the use of an additional person to help the clearly unqualified who cannot perform on their own."  *Id.*

The GSA contends that Cogdell likewise is not a qualified individual because he testified during a deposition that "he was unable to perform his essential functions without having a job coach constantly at [his] side."  Def.'s Cross-Mot. Summ. J. at 25.  But a review of the cited deposition testimony shows that Cogdell appeared to merely be expressing his desire to have the assistance of a job coach throughout the workday, based on his own understanding of his needs. *See* Cogdell Dep. Tr., Ex. 1 to Def.'s Cross-Mot. Summ. J. at 151:11–152:2.  Saying that he "would love to have that job coach at [his] elbow for 90 workdays," he does not go so far as to say that he would not have been able to perform his job functions without a job coach.  *Id.* at

151:21–22.  Because the GSA does not point to any other reasons beyond this statement for why

Cogdell is not a "qualified individual," the Court declines to make such a finding here.  Whether

Cogdell in fact needed a job coach throughout the workday, as opposed to simply one hour a

week as requested by Dr. Lee, and whether Cogdell was in fact performing the essential

functions of his job at the time are questions of fact appropriate for a jury.  In short, the Court

must deny both Cogdell and the GSA's motions for summary judgment to the extent that they

seek summary judgment on Cogdell's failure-to-accommodate claim.

### B.  Discrimination

For cases where a plaintiff offers no direct evidence of discrimination, *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*,

450 U.S. 248 (1981), have set forth a three-step, burden-shifting standard for resolving disability

discrimination claims brought under the Rehabilitation Act.  *See Chatterjee v. Ross*, No. 16-cv-

2402, 2020 WL 6709757, at *5 (D.D.C. Nov. 16, 2020), *aff'd sub nom. Chatterjee v. Raimondo*,

No. 20-5363, 2022 WL 829766 (D.C. Cir. Mar. 17, 2022).  The D.C. Circuit has summarized this

framework:

> Under the *McDonnell Douglas* framework, a plaintiff must make out a prima facie case
> of discrimination; once [he] has done so, the defending employer must "articulate some
> legitimate, nondiscriminatory reason" for its action.  *Burdine*, 450 U.S. at 252-53
> (quoting *McDonnell Douglas*, 411 U.S. at 802).  Should the employer carry its burden at
> the second step, the plaintiff must prove that the employer's asserted reasons "were not
> its true reasons, but were a pretext for discrimination."  *Id.* at 253.

*Jeffries v. Barr*, 965 F.3d 843, 859–60 (D.C. Cir. 2020).

The D.C. Circuit has previously instructed that four factors are "paramount" at the second

prong of this analysis.  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).  First, "the

employer must produce evidence that a factfinder may consider at trial (or a summary judgment

proceeding)." *Id.*; *see also id.* at 1092 (holding that "an employer . . . must proffer admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions"). Second, "the factfinder, if it 'believed' the evidence, must reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason." *Id.* at 1087 (quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004)). Third, the nondiscriminatory explanation must be "facially credible in light of the proffered evidence." *Id.* at 1088 (cleaned up). Fourth, and finally, the evidence must provide a "clear and reasonably specific explanation." *Id.* (quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C. Cir. 1984)). But the employer need only produce evidence that "raises a genuine issue of fact as to whether it discriminated against the plaintiff," and "need not persuade the court that it was actually motivated for the proffered reasons." *Burdine*, 450 U.S. at 254. The employer "does not have an obligation to support [its] reasons with objective evidence sufficient to satisfy the preponderance of the evidence standard . . . because the plaintiff at all times retains the ultimate burden of persuasion." *Evans v. Atwood*, 38 F. Supp. 2d 25, 32 (D.D.C. 1999).

If the employer articulates a legitimate, nondiscriminatory reason for an adverse employment action, "the district court need not examine whether the plaintiff established a prima facie case of discrimination." *Williams v. Ct. Servs. & Offender Supervision Agency for D.C.*, 110 F. Supp. 3d 111, 121 (D.D.C. 2015), *aff'd sub nom. Williams v. Ct. Servs. & Offender Supervision Agency*, No. 15-5277, 2016 WL 10968672 (D.C. Cir. May 31, 2016). Instead, "the 'central question' at summary judgment becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee.'" *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015)

(quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)).  In other words, the plaintiff must

show "*both* that the reason was false, *and* that discrimination was the real reason."  *Webster v.*

*United States Dep't of Energy*, 443 F. Supp. 3d 67, 78 (D.D.C. 2020) (quoting *St. Mary's Honor*

*Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

In "[e]valuating whether an employee may proceed to trial," a court considers "'all the

evidence, which includes not only the prima facie case but also the evidence the plaintiff offers

to attack the employer's proffered explanation for its action and [any] other evidence.'"  *Morris*

*v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting *Gaujacq v. EDF, Inc.*, 601 F.3d 565,

577 (D.C. Cir. 2010)).  But surviving summary judgment does not require the employee to

"provide evidence beyond that rebutting the employer's stated explanation."  *Id.*  Rather, an

employee may avoid summary judgment simply "by providing enough evidence for a reasonable

jury to find that the employer's proffered explanation was a pretext for retaliation or

discrimination."  *Id.*  To support an inference that the employer's stated reasons were pretextual,

an employee may cite:

> the employer's better treatment of similarly situated employees outside the plaintiff's
> protected group, its inconsistent or dishonest explanations, its deviation from established
> procedures or criteria, or the employer's pattern of poor treatment of other employees in
> the same protected group as the plaintiff, or other relevant evidence that a jury could
> reasonably conclude evinces an illicit motive.

*Walker*, 798 F.3d at 1092 (citing *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 & n.3

(D.C. Cir. 2008)).

Here, the GSA has proffered a legitimate, nondiscriminatory reason for denying

Cogdell's request for advanced sick leave: the GSA's policies only allow for approval of

requests for advanced sick leave where there is a reasonable expectation that the employee will

return to work upon recovery from the illness, and Hobson concluded that, based on Cogdell's

medical certification, there was not such a reasonable expectation that he would be returning to work.  Def.'s Cross-Mot. Summ. J. at 36 (citing Ex. 45 to Def.'s Cross-Mot. Summ. J.). Considering the four *Figueroa* factors, the Court concludes that GSA has met its burden under the second prong of *McDonnell Douglas*.

First, the Court will consider the evidence proffered by the GSA, given that Cogdell does not contest its admissibility.  *See Hogan v. Hayden*, 406 F. Supp. 3d 32, 43 (D.D.C. 2019). Second, the GSA has presented evidence that would allow a factfinder to reasonably be able to find that its action was motivated by a nondiscriminatory reason.  Hobson based her denial on the medical certification that Cogdell provided.  Ex. 45 to Def.'s Cross-Mot. Summ. J. at 2.  As Wycinsky highlighted in his own response to Cogdell, *see* Ex. 44 to Def.'s Cross-Mot. Summ. J. at 2, Dr. Lee's medical certification was less than certain about the amount of time that Cogdell would need to recover, stating that "[t]he amount of time needed to recover enough to return to work is just an estimate right now" and "[t]here are many factors involved in his rather complex medical situation," Ex. 43 to Def.'s Cross-Mot. Summ. J. at 2.  She advised that it would be "impossible to predict the duration of related incapacity [Cogdell] may have over the next [six] months, as the duration of symptoms varies," indicating that the emergency request would only account for "more intensive treatment over the next [eight] weeks without the stress of workplace triggers."  *Id.* at 5.

Considering that the evidence shows that Cogdell's conditions had worsened, *see id.* at 4, and that his recent communications had left his colleagues concerned about his well-being, *see* Ex. 39 to Def.'s Cross-Mot. Summ. J.  at 2, ECF No. 53-42, a factfinder could reasonably find that Hobson did not believe that Cogdell would be in a position to return to work, *cf. Minter v. District of Columbia*, 809 F.3d 66, 70–72 (D.C. Cir. 2015) (affirming the district court's grant of

summary judgment against retaliation claim raised by plaintiff, who had not performed a day of work in more than three months and had said only that she "hope[d]" to return to work, "depending on present treatment"). And indeed, Cogdell himself appears to concede that the GSA "gave a legitimate reason to deny the advanced sick leave," even though he argues that the reason was legitimate only as of the "moment in time" when it was issued on December 30, 2014. Pl.'s Opp'n at 29.

Third, the GSA's reason is facially credible. True, there is evidence weighing in the opposite direction, which led to the Court commenting that the GSA had a "dubious explanation" when the Court was required to grant Cogdell all reasonable inferences in his favor at the motion to dismiss stage. Most notably, Dr. Lee wrote in her email attaching the medical certification that Cogdell had "shared with [her] that he plans to return to work." Ex. 43 to Def.'s Cross-Mot. Summ. J. at 2. Wycinsky also acknowledged this language in his response to Cogdell when he stated: "*Although you plan to return to work*, the amount of time needed for you to recover to return to work is an estimate right now." Ex. 44 to Def.'s Cross-Mot. Summ. J. at 2 (emphasis added). Wycinsky further indicated that he expected Cogdell to "return to a work status on February 3, 2015." *Id.* at 3. The relevant question at this stage, however, is not whether the Court is convinced by the reason given by the GSA,[6] but only whether a jury could reasonably find based on the evidence that the GSA's action was motivated by a nondiscriminatory reason.

---

[6] The Court also does not consider whether Hobson's interpretation of the GSA policy, which states that advanced sick leave may be granted only if there is a "reasonable expectation that the employee will return to work *upon recovery from illness*," was applied correctly. Ex. 10 to Def.'s Cross-Mot. Summ. J. at 28 (emphasis added). Although "[a]n inference of pretext could be appropriate where 'the employer made an error too obvious to be unintentional,'" *Lane v. District of Columbia*, No. 17-cv-01484, 2021 WL 3886304, at *8 (D.D.C. Aug. 31, 2021) (quoting *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)), Cogdell does not here take issue with Hobson's application of the GSA policy, so the Court likewise does not consider whether Hobson may have erred.

*See Burdine*, 450 U.S. at 254.  The Court finds that the GSA has provided sufficient evidence to meet this standard.

Finally, the explanation is clear and reasonably specific, allowing Cogdell to have "a full and fair opportunity to attack the explanation as pretextual."  *Hogan*, 406 F. Supp. 3d at 43 (quoting *Figueroa*, 923 F.3d at 1088).  Cogdell is "on notice of what reasoning he must challenge."  *Figueroa*, 923 F.3d at 1091.

Accordingly, the burden shifts to Cogdell to show that the GSA's proffered reason was merely a pretext for discrimination.  *See Barr*, 965 F.3d at 860.  Cogdell's only retort to the GSA's explanation is that Cogdell returned to work on December 31, 2014—one day after Hobson's denial of his request on December 30, 2014—and the GSA did not subsequently reverse its decision in light of this new information.  Pl.'s Opp'n at 28–29.  According to Cogdell, the GSA's "fail[ure] to account for the advanced sick leave . . . in its later letters to the Plaintiff summarizing the history of the Plaintiff's reasonable accommodation requests and the Defendant's 'aggregate' grants of these requests . . . is indicative of a discriminatory intent."  *Id.* at 29.  He says that he need not have "renewed his request for the advanced sick leave" because it was "not [his] responsibility to oversee the actions, certainly dishonest actions, of the Defendant as part of the reasonable accommodation interactive process."  *Id.*

But Cogdell offers no caselaw in support of the premise that because the GSA did not independently revisit a decision based on new information, without a request for reconsideration, that decision must have been made with discriminatory intent.  As the GSA argues, it would be unreasonable to judge Hobson's decision on December 30, 2014 based on information that she would not have known at the time.  Def.'s Cross-Mot. Summ. J. at 45; *cf. Amadio v. Ford Motor Co.*, 238 F.3d 919, 928 (7th Cir. 2001) ("The facts relevant to a determination of whether a

medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision."). Because Cogdell does not otherwise point to any evidence in the record showing that the GSA's reason was mere pretext for discrimination, the Court grants the GSA's motion for summary judgment on Cogdell's discrimination claim.[7]

### C.  Retaliation

Cogdell further alleges retaliation under the Rehabilitation Act, claiming that, by denying his request for advanced sick leave, the GSA retaliated against him for engaging in protected activity. *See* Am. Compl. ¶ 136; *Cogdell*, 2020 WL 6822683, at *13. A claim of retaliation under the Rehabilitation Act requires four elements: "(1) that the plaintiff 'engaged in protected activity'; (2) that the plaintiff 'was subjected to adverse action by [his] employer'; and (3) 'that there was a causal link between the adverse action and the protected activity.'" *Cogdell*, 2020 WL 6822683, at *11 (quoting *Drasek*, 121 F. Supp. 3d at 162). The *McDonnell Douglas* burden-shifting framework, as articulated above, also applies. *See, e.g.*, *Cong. v. Gruenberg*, 643 F. Supp. 3d 203, 229 (D.D.C. 2022).

Here, the GSA reiterates that Hobson denied Cogdell's request for advanced sick leave in compliance with GSA policy because she did not have a reasonable expectation that he would return upon recovery from illness. Def.'s Cross-Mot. Summ. J. at 49. Again, because the GSA has proffered a non-retaliatory rationale for denying Cogdell's request for advanced sick leave, this Court turns to the question of whether Cogdell has shown that the GSA's reason was pretext

---

[7] In his opposition to the GSA's cross-motion for summary judgment, Cogdell also raises the argument that "the denial of the advanced sick leave violated the Rehabilitation Act because it was an accommodation unlawfully denied." Pl.'s Opp'n at 29. To the extent that Cogdell seeks to raise such a claim belatedly, "[n]ew claims cannot be pled in summary judgment briefs." *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 127 (D.D.C. 2013); *see also Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press claims not raised in their amended complaint.").

for retaliation.  *See Gruenberg*, 643 F. Supp. 3d at 235.  And for the same reasons explained above, Cogdell has not pointed to any evidence demonstrating pretext.  Thus, the Court grants the GSA's motion for summary judgment on Cogdell's retaliation claim.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment (ECF No. 52) is **DENIED**, and Defendant's Cross-Motion for Summary Judgment (ECF No. 53) is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 29, 2023                          RUDOLPH CONTRERAS
                                                   United States District Judge